**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leonorilda Ochoa, *et al.*, | No. CV-18-00905-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Mesa, *et al.*, | |
| Defendants. | |

At issue is Defendants City of Mesa and Officers Charles J. Evans, Manuel R. Celaya, Jr., Robert E. Gambee, Jr., Jess C. Nicholson, Kari R. Savage, Brian K. Hermes, and Jason G. Stout's ("Mesa Defendants") Motion for Summary Judgment (Doc. 72)[1] and Statement of Facts (Doc. 73, "MSOF"),[2] to which Plaintiffs filed a Response (Doc. 89) and a Controverting Statement of Facts and Separate Statement of Facts (Doc. 90, "Pl. CSOF to Mesa" & "Pl. SSOF to Mesa"), and Mesa Defendants filed a Reply (Doc. 99) and Response to Plaintiffs' Statement of Facts (Doc. 100).

Also at issue is Defendants Town of Gilbert and Officers Steve Gilbert and Jacob Madueno's ("Gilbert Defendants") Motion for Summary Judgment (Doc. 75) and

---

[1] After the Defendants' Motions were filed, the parties stipulated that judgment be entered in favor of Mesa Officer Evans for all claims against him. (Docs. 88, 94.) This Order therefore collectively refers to the remaining Defendant Mesa officers, Celaya, Gambee, Nicholson, Savage, Hermes, and Stout, as the "Mesa Officers." When referring to the Mesa Officers and Gilbert Police Officers Steve Gilbert and Jacob Madueno, the Order uses the term "Defendant Officers."

[2] In addition to filing their own, the Gilbert Defendants joined the Mesa Defendants' Statement of Facts. (Doc. 77.)

1   Statement of Facts (Doc. 76, "GSOF"), to which Plaintiffs filed a Response (Doc. 91) and

2   a Controverting Statement of Facts and Separate Statement of Facts (Doc. 92, "Pl. CSOF

3   to Gilbert" & "Pl. SSOF to Gilbert"), and Gilbert Defendants filed a Reply (Doc. 96) and

4   Response to Plaintiffs' Statement of Facts (Doc. 97). For the reasons that follow, the Court

5   grants Defendants' Motions as to Plaintiffs' constitutional claim and remands to state court

6   for resolution of the remaining state law claim.

7   **I.    BACKGROUND**

8       This is a 28 U.S.C. § 1983 and wrongful death action stemming from the death of

9   Sergio Ochoa ("Sergio"). Plaintiffs are Leonorilda Ochoa, Sergio's mother; Rachel Garcia,

10  on behalf of minors S.G. and G.G.;[3] and Kerry Lynn Coniglio on behalf of minor C.J.C.

11  Erika Garcia has also joined on behalf of statutory beneficiaries and minors J.O. and J.G.

12  (*See* Docs. 71, 81, 93.)

13      The following facts are either undisputed by the parties or retrieved from an officer's

14  Axon body camera. On the night of March 3, 2016, Mesa Officers each became aware, via

15  police broadcast, of a domestic violence 911 call from a woman regarding a fight she had

16  with an ex-boyfriend. (MSOF ¶ 1; Pl. CSOF to Mesa ¶ 1.) The confrontation involved a

17  gun, and the ex-boyfriend had recently used "methamphetamine or heroin." (MSOF ¶ 1;

18  Pl. CSOF to Mesa ¶ 1.) Mesa Officers learned the ex-boyfriend had fled in a vehicle.

19  (MSOF ¶ 1; Pl. CSOF to Mesa ¶ 1.) Officer Stout learned from dispatch that the man,

20  Sergio Ochoa, had outstanding arrest warrants. (MSOF ¶ 4, Ex. C ¶ 5; Pl. CSOF to Mesa

21  ¶ 4)

22      Approximately eight minutes later, Mesa Officers individually learned from a

23  second radio broadcast that a person had entered a stranger's home claiming he had been

24  stabbed. (MSOF ¶ 2; Pl. CSOF to Mesa ¶ 2.) Dispatch reported that the man possessed

25  knives and had fled the stranger's home in a vehicle. (MSOF ¶ 2; Pl. CSOF to Mesa ¶ 2.)

26  Mesa Officers also learned from the radio broadcast that the first and second hot calls may

27  be related. (MSOF ¶ 3; Pl. CSOF to Mesa ¶ 3.) A Mesa Air Unit located a vehicle that

28  _____

    [3] After Defendants' Motions were filed, the parties stipulated that judgment be
    entered against Plaintiff minor G.G. (Docs. 88, 94.)

matched the description driving on Southern Avenue in Mesa. Mesa Officers heard from the radio broadcast that the vehicle had failed to yield to a marked police car that attempted to stop the vehicle. (MSOF ¶ 6; Pl. CSOF to Mesa ¶ 6.) The radio broadcast called out that the subject had driven into a residential neighborhood in Gilbert and exited the vehicle. (MSOF ¶ 7; Pl. CSOF to Mesa ¶ 7.)

During the course of the above events, Defendant Gilbert Police Officer Madueno was patrolling near Lindsay Road and Baseline Road, an area near the Gilbert-Mesa border, in his K-9 vehicle. (Doc. 97 Ex. A at 29.) He was listening to both the Mesa and Gilbert "hot channels." While listening to Mesa's hot channel, Madueno learned there was a stabbing incident nearby. "Dispatch advised that . . . Ochoa was [] a stabbing suspect who had just assaulted his ex-wife." (Doc. 97 Ex. A at 29.) Defendant Gilbert Police Officer Gilbert was at the police station when he "initially heard a radio call reference a possible stabbing suspect, which was originally in the area of Lindsay and Baseline." (Doc. 97 Ex. B at 21.)

Defendant Officers all converged in the neighborhood reported by the Air Unit and learned the subject was inside a residence located at 629 E. Cathy Drive. Defendant Officers all aver that when they arrived at the home, a man in the second story was evacuating two children. (MSOF Ex. A ¶ 10, Ex. B ¶ 5, Ex. C ¶ 12, Ex. D ¶ 7, Ex. E ¶ 6, Ex. F ¶ 10; GSOF Ex. I ¶ 6, Ex. J ¶ 6.) This scene is also depicted on an Axon body camera worn by Gilbert. (*See* Doc. 97 Ex. C; Doc. 103.) The man on the second story appeared frantic and indicated that another man was inside the home who was not supposed to be there. (*E.g.*, MSOF Ex. A ¶ 10; GSOF Ex. I ¶ 6, Ex. J ¶ 6.) Two nonparty Mesa officers helped the children off the roof. (MSOF Ex. A ¶ 11.)

The six Mesa Officers and Madueno surrounded the front of the home. Through windows in the front they could see another man—Sergio Ochoa—inside interacting with two female occupants. Gambee states he saw Sergio come up to the window holding knives and yelling, and says he looked and sounded agitated and angry. (MSOF Ex. A ¶¶ 12–13.) Celaya reports he saw Sergio inside and that he appeared agitated and pacing. (MSOF

Ex. B ¶ 6.) Celaya heard another officer yell that Sergio had a knife. (MSOF Ex. B ¶ 6.) Stout states he could see Sergio holding a knife while looking agitated and angry, and "appeared to be arguing with a female next to him within arm's reach." (MSOF Ex. C ¶ 13.) Stout also perceived that the woman was pleading with Sergio and notes Sergio made a "very demonstrative yell while still holding the knife." (MSOF Ex. C ¶ 13.) Nicholson and Hermes both state Stout, who had a better vantage point than them, relayed to them that Sergio was holding a knife while standing very close to a female. (MSOF Ex. D ¶ 8, Ex. E ¶ 7.) Savage reports she could see Sergio and two females through a window at the front door, that she heard the women yelling, and that she heard Sergio yell at the officers through the door. (MSOF Ex. F ¶ 11.) Madueno reports he saw Sergio through one of the windows and describes him as appearing "angry, agitated, and restless." (GSOF Ex. I ¶ 7.) Madueno, who is trained as a Drug Recognition Expert, believed Sergio was under the influence of drugs, and more specifically, methamphetamine.[4] (GSOF Ex. I ¶ 7.)

Multiple officers shouted at Sergio, identifying themselves as police and commanding him to drop the knives and come outside. (MSOF Ex. A ¶ 12, Ex. C ¶ 13, Ex. F ¶ 11.) Sergio failed to comply.

Mesa Officers and Madueno aver, based on the totality of the circumstances, they believed Sergio posed an immediate and serious physical threat to the female occupants inside, and decided they needed to enter the home. (MSOF Ex. A ¶ 13, Ex. B ¶ 8, Ex. C ¶ 15, Ex. D ¶ 9, Ex. E ¶ 8, Ex. F ¶ 12; GSOF Ex. I ¶ 8.) Stout kicked open the locked front door. (MSOF ¶ 12; Pl. CSOF to Mesa ¶ 12.) Sergio ran toward the back of the home and exited into the backyard through a sliding door. Somewhere around this time, Gilbert went around the side of the home and observed Sergio in the backyard holding two large knives. (GSOF Ex. J ¶ 8.) Gilbert hopped the eastern wall as he witnessed Sergio head toward the western side, which he believed Sergio might try to scale and flee. (GSOF Ex. J ¶ 9.)

Simultaneously, Mesa Officers and Madueno, with his K-9 officer, followed Sergio through the home and into the backyard. It is undisputed that Sergio was holding two large

---

[4] Postmortem toxicology reports of Sergio Garcia revealed a blood concentration of .32 mg/L of methamphetamine. (Doc. 76-2 at 44.)

knives—one nine inches long and a broader six-inch one—in the backyard. (MSOF ¶ 15; Pl. CSOF to Mesa ¶ 15; *see* MSOF Ex. J.) Mesa Officers, who had fanned out in the backyard in a slight semi-circle formation (*see* MSOF Ex. I), repeatedly yelled at Sergio to drop the knives, but Sergio did not. (MSOF ¶ 16; Pl. CSOF to Mesa ¶ 16.)

The next events are portrayed on an eight-second recording from an Axon body camera worn by Madueno. (MSOF Ex. K; Doc. 80.) The first few seconds show Madueno exiting the home with the police dog through the back sliding door. Several Mesa Officers are in front of him and already in the backyard. Sergio is seen in the middle-back portion of the yard toward the west side. At second 3, the video blurrily shows Sergio facing the officers and making significant movements, but it is not clear in what direction he is moving. His arms are raised out to his side, just below shoulder length, holding the knives. The video cuts away from Sergio momentarily.

At second 4, the video pans back to Sergio as Madueno releases the dog. Sergio is still facing the officers at the moment of release. The video clearly shows Sergio move his right leg back, away from the officers, so that he is standing in a position parallel to the yard's western sidewall, rather than directly facing the officers. As the dog approaches and runs by him, Sergio is standing upright with his arms down at his side. The body camera then pans down so that Sergio is momentarily out of view again.

By the time the camera pans back up, Sergio has changed his position slightly and appears to be opening his stance. At second 5, Sergio takes one large side step to his left—something between a side skip and a lunge—in the direction of the police. At this point, all six Mesa Officers and Gilbert fire their guns. The video depicts shots being fired for several seconds before Sergio falls to the ground. Plaintiffs submit that, in total, over 30 rounds were deployed at Sergio. (*E.g.*, Pl. CSOF to Mesa ¶ 5.) At the time he was shot, Sergio was approximately 16 feet from Celaya and Gambee. (MSOF ¶ 21; Pl. CSOF to Mesa ¶ 21.) Officer Evans avers that before Sergio took his last step in the direction of the officers, Evans fired a non-lethal beanbag round. (DSOF Ex. G ¶ 22.)

Plaintiffs dispute several facts—which the Court resolves in Plaintiffs' favor for purposes of this Motion—and submit additional facts as follows. Approximately 16 seconds elapsed from the moment the police entered the home to the time Defendant Officers ceased fire on Sergio. While inside the home, Sergio was not threatening the two female occupants, who were Rachel Garcia and her mother, Sherry Dyer. Rather, Garcia and Dyer say Sergio believed he was being followed, that he feared for his life, and that he grabbed the knives for his own protection. (PSOF ¶¶ 3–4.) Garcia and Dyer were attempting to calm Sergio down. They declare he was always welcome in their home and that no hostage situation existed. (PSOF ¶¶ 5–6.)

Plaintiffs submit that after the officers finished firing their guns, Madueno again released the police dog, which bit and dragged Sergio's lifeless body as Defendant Officers laughed and cheered. (PSOF ¶¶ 18–19.) The Court also notes Plaintiffs dispute Sergio ever took a step toward the officers, contending he only non-aggressively stepped back because he was scared. However, the body camera clearly shows Sergio took a large step in the direction of the officers immediately before they deployed their weapons. *See Scott v. Harris*, 550 U.S. 372 (2007) (adopting the version of facts depicted on the videotape rather than the version told by a party).

Plaintiffs filed this action in state court in February 2018 and Defendants removed. (Doc. 1.) The parties eventually stipulated to dismiss the negligence claim and any *Monell* claims against the City of Mesa and Town of Gilbert. (Docs. 88, 94.) Thus, what remains of Plaintiffs' claims are (1) a claim under 28 U.S.C. § 1983, specifically alleging an underlying Fourteenth Amendment violation, and (2) wrongful death under A.R.S. § 12-611. Defendants move for summary judgment on both.

## II.   LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,*

477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, the Court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

## III.   ANALYSIS

### A.   Fourteenth Amendment Claim

Plaintiffs allege Defendants deprived them of their Fourteenth Amendment substantive due process right of familial association and companionship with their son and father, Sergio Ochoa. A long-recognized constitutional right and basis for a § 1983 claim in this circuit, this claim may be brought only by the parents or children of the decedent. *See Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991); *Porter v. Osborn*, 546 F.3d 1131, 1132 (9th Cir. 2008). While this Fourteenth Amendment claim

is often brought in conjunction with a claim of excessive force under the Fourth Amendment, the two are distinct and the former demands a higher standard of culpability from the Defendant Officers. Plaintiffs must prove Defendant Officers' actions on the night of March 3, 2016 "shocked the conscience." *Porter*, 546 at 1137.

### 1.     Actual Deliberation

Two subset standards of culpability live within the shock-the-conscience framework. If the circumstances are such that "actual deliberation" by a defendant officer is practical, "deliberate indifference" to his or her acts or omissions shocks the conscience. *Id.* (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)). If actual deliberation is not practical, a more stringent standard, the "purpose to harm" standard, applies. *Id.* Thus, the Court must first determine if a genuine question exists as to whether Defendant Officers had the ability to actually deliberate their course of conduct.

According to the Supreme Court and Ninth Circuit, deliberation "should not be interpreted in the narrow, technical sense." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *see also Lewis*, 523 U.S. at 837 (holding the purpose to harm standard applied in a high-speed car chase aimed at apprehending the suspect, even if the officer technically could deliberate while alone in his vehicle and pursuing the suspect). Actual deliberation is not practical "when an officer encounters fast paced circumstances presenting competing public safety obligations." *Porter*, 546 F.3d at 1139. Thus, in situations that "escalate so quickly that the officer must make a snap judgment," the purpose to harm standard must apply. *Id.* at 1137.

The Ninth Circuit analyzes whether deliberation is practical on a spectrum. For example, in *Moreland*, police officers responded to a gun fight in a crowded parking lot. *Moreland v. Las Vegas Metro. Police Dep't*, 59 F.3d 365, 372 (9th Cir. 1998). The officers had to "address a life-threatening situation" in which they faced competing obligations: to allow the shooters to continue firing or to fire upon the shooters to end the threat. The court found this inherently fast-paced and urgent situation strongly compelled application of the purpose to harm standard. *Id.*

In *Porter*, two officers received a call about a "suspicious" car on the side of a road. 546 F.3d at 1132. The officers initially believed the car was abandoned, but as they stood nearby, a man sat up in the drivers' seat, grabbed the steering wheel, and began to slowly turn the car around. The officers turned on their lights and shouted at the driver to stop and exit the vehicle. The driver stopped and, wearing a "confused look on his face," rolled down his window but did not get out of the car. *Id.* at 1134. The first officer deployed pepper spray inside the car. The driver went into the fetal position and covered his face, but eventually bolted upright again, stared ahead, grabbed the steering wheel, and revved the engine. At that moment, the second officer shot and killed the driver. The whole encounter—from dispatch to shots fired—lasted five minutes. Less than one minute elapsed between the pepper spray and the shooting. *Id.* at 1135. The Ninth Circuit noted the events were in "constant flux, with much yelling, confusion and a driver who was refusing to exit or stop his car." *Id.* at 1140. While a closer call than *Moreland*, the court held the purpose to harm standard must govern, as the driver's "evasive actions" necessitated quick reactions by the officers. *Id.*

Here, application of the purpose to harm standard is "clearly appropriate." *See Wilkinson*, 610 F.3d at 555. By the time Mesa Officers arrived at Garcia's home, they were aware that the suspect, Sergio, had been involved in a domestic violence incident, entered a stranger's home and then fled while carrying knives, failed to yield to a marked police car, and entered into another home—629 E. Cathy Drive. Gilbert and Madueno tesify only that they knew Ochoa was the subject involved in a stabbing incident. Defendant Officers all witnessed a man evacuating two children from the home's second story. They all either personally observed or were informed that Sergio was inside holding knives while interacting with two women and appearing agitated and angry. Sergio ignored multiple commands to drop the knives and come outside.

Perceiving the situation to be dangerous and volatile, Mesa Officers and Madueno kicked down the door. As Plaintiffs themselves contend, only 16 seconds elapsed from that moment until the time they fired at Sergio, during which Sergio ran into the backyard,

refused to surrender, and ultimately took a large step toward the officers while holding two large knives.

Defendant Officers had to make multiple "snap judgments" during a quickly escalating situation in which they were concerned for the acute safety of both the occupants inside and their own. On these undisputed facts and in light of binding precedent involving apparently less dangerous and urgent situations, such as in *Porter*, the Court finds as a matter of law the Defendant Officers lacked the opportunity to actually deliberate. Therefore, the higher purpose to harm standard governs Plaintiffs' constitutional claim.[5]

## 2.    Purpose to Harm

An officer acts with a purpose to harm when his or her actions are unrelated to legitimate law enforcement objectives. *Wilkinson*, 610 F.3d at 554. "Legitimate law enforcement objectives include, among others, arrest, self-protection, and protection of the public." *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018). Conversely, an officer "lacks such legitimate law enforcement objectives when the officer had any ulterior motives for using force against the suspect, such as to bully a suspect or get even, or when an officer uses force against a clearly harmless or subdued suspect." *Id.*

Plaintiffs have put forth no evidence showing Defendant Officers acted with anything less than legitimate law enforcement objective in carrying out their actions. As already noted, Defendant Officers averred that by the time Stout kicked down the front door, they were all aware of at least some dangerous crime the suspect was involved in, although Mesa Officers put forth more detail of the extent of their knowledge. All Defendant Officers were aware Sergio was inside a home holding knives, standing close to two female occupants, and looking and sounding agitated and angry. They were aware of his noncompliance and failure to heed their commands to drop the knives and exit the home. Mesa Officers were aware that he had recently used "methamphetamine or heroin,"

---

[5] The Court also rejects Plaintiffs' attempt to create a factual dispute as to whether Defendant Officers created the emergency they then resorted to deadly force to resolve. (*See* Docs. 89, 91.) The facts as just reiterated demonstrate Defendant Officers were responding to a situation created by an apparently dangerous and non-compliant suspect who they understood had recently committed multiple crimes while under the influence of hard drugs.

and Madueno perceived that Sergio was under the influence of methamphetamine. They were aware that one occupant had indicated Sergio was not supposed to be inside the home. They were aware that that same occupant had just evacuated two children from the second story of the home.

By the time Defendant Officers were in the backyard, they were also aware Sergio had again refused to surrender when they entered the home, and instead fled to the backyard. Sergio was visibly holding two large knives. And while the video camera shows Sergio did take one step back and lower his arms as the dog ran by him, it also depicts him just one second later taking a large step in the direction of the officers and the home. In deploying their weapons, at least four law enforcement objectives are apparent: officer safety, protection of the occupants still inside the home, apprehension of an apparently dangerous suspect, and protection of the public at large in the event Sergio escaped from the backyard.

It bears repeating that the standard and analysis governing Plaintiffs' Fourteenth Amendment deprivation of substantive due process claim is different from an excessive force claim under the Fourth Amendment. Indeed, "it may be possible for an officer's conduct to be objectively unreasonable yet still not infringe the more demanding standard that governs due process claims." *Moreland*, 159 F.3d at 371 n.4. Here, the question is not whether the amount of Defendant Officers' force was excessive, but whether they acted with legitimate law enforcement objectives. The Court answers that question with a definitive "yes." *See Wilkinson*, 610 F.3d at 554–55 ("Because [the officer] was in a rapidly evolving situation requiring him to make 'split-second judgments,' we need not scrutinize as closely . . . [his] decision about how best to minimize the risk to his own safety and the safety of others.").

Finally, the fact that Sergio knew the women and that they did not feel threatened is immaterial. "[T]he Court considers only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017). The Court need not rehash those facts. The disputed fact of whether Defendant Officers laughed and cheered as the police

dog dragged Sergio's lifeless body is also immaterial. Those actions, if they were in fact taken, did not deprive the Sergio's family members of his society and companionship. The firing of the Defendant Officers' weapons did, but the Court has already concluded as a matter of law that the deployment of their firearms was undertaken with legitimate law enforcement objectives.

Accordingly, Defendants are entitled summary judgment on Plaintiffs' Fourteenth Amendment claim.

### B.   Wrongful Death

Plaintiffs' remaining claim is brought under Arizona's wrongful death statute, A.R.S. § 12-611. This case was removed from state court based on this Court's subject matter jurisdiction over Plaintiffs' § 1983 claim. (Doc. 1.) Now that the federal claim is dismissed, the Court has discretion to either retain supplemental jurisdiction over Plaintiffs' state law claim, *see* 28 U.S.C. § 1367(c)(3), or remand the action to state court. "The Supreme Court has stated, and we have often repeated, that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Here, the federal law claim is eliminated well before trial. As to Plaintiffs' remaining state law claim, Defendants raise issues involving various state statutes, including standing of statutory beneficiaries in a wrongful death action, issues regarding the statute of limitations, state law presumptions of reasonableness, and the affirmative defense of justification. The Court therefore declines to exercise supplemental jurisdiction over Plaintiffs' wrongful death claim.

**IT IS THEREFORE ORDERED** granting Defendants' Motions for Summary Judgment (Docs. 72, 75) as to Plaintiffs' 28 U.S.C. § 1983 claim. Plaintiffs' wrongful death claim is remanded for adjudication in state court.

1       **IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment for

2   Defendants on Plaintiffs' § 1983 claim ("Count II") only, remand the remaining state law

3   claim to the Superior Court of Arizona in and for Maricopa County, and terminate this

4   matter.

5       Dated this 1st day of May, 2020.

6

7                Honorable John J. Tuchi
             United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28